**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BRIAN LISTER, | |
| Plaintiff, | Case No. 1:19-cv-07250 |
| v. | The Honorable Steven C. Seeger |
| RUSSELL HEISNER, ZAIDA NDIFE, STRICKLAND (FIRST NAME UNKNOWN), BRIJ MOHAN, BONNIE NOWAKOWSKI, HARRIS (FIRST NAME UNKNOWN), and CLARK-WILLIAMS (FIRST NAME UNKNOWN), | |
| Defendants. | |

<u>**VERIFIED FIRST AMENDED COMPLAINT**</u>

Plaintiff Brian Lister ("Mr. Lister") by and through his attorneys, files this Verified First Amended Complaint against Russell Heisner ("Heisner"), Zaida Ndife ("Ndife"), Strickland (first name unknown) ("Strickland"), Brij Mohan ("Mohan"), Bonnie Nowakowski ("Nowakowski"), Harris (first name unknown) ("Harris"), Clark-Williams (first name unknown) ("Clark-Williams") (collectively "Defendants"). In support of his claims, Mr. Lister alleges and states as follows:

**INTRODUCTION**

1.      Mr. Lister is a federal prisoner suffering from Type I Diabetes. Mr. Lister is housed at the Metropolitan Correctional Center in Chicago, Illinois ("MCC") while he waits the resolution of his criminal case. Mr. Lister's constitutional rights have been violated by the Defendants' continued and consistent deliberate indifference toward his acute medical and dietary needs during his incarceration at MCC over the last six months.

2.      On November 4, 2019, Mr. Lister filed a pro se complaint against Defendant Heisner and Defendant Mohan, alleging that they have not treated his "existing diabetes, leaving [Mr. Lister] at a borderline attack crisis."

3.     On December 13, 2019, the Court dismissed Mr. Lister's pro se complaint without prejudice and appointed counsel to file this Verified First Amended Complaint.

4.     Mr. Lister brings this action pursuant to Title 42 U.S.C. § 1983 to redress violations of the Eighth Amendment to the United States Constitution.

5.     Mr. Lister seeks actual, consequential, compensatory, and punitive damages, as well as attorneys' fees and court costs from Defendants.

## JURISDICTION AND VENUE

6.     Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because the matters in controversy arise under the Constitution and laws of the United States.

7.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that give rise to Mr. Lister's claims took place within the Northern District of Illinois.

8.     This Court has authority pursuant to 42 U.S.C. § 1983 to award appropriate actual, consequential, compensatory, and punitive damages, and has authority under 42 U.S.C. § 1988 to award attorney fees and costs to successful civil rights plaintiffs.

9.     Mr. Lister has exhausted all administrative remedies available to him prior to bringing this 42 U.S.C. § 1983 civil rights lawsuit within the meaning of the Prison Litigation Reform Act, 42 U.S.C. § 1997(e)(a).

## PARTIES

10.     Plaintiff Brian Lister, a federal prisoner in the custody of the U.S. Marshalls Service awaiting trial, is housed at MCC.  He entered the custody of the U.S. Marshalls Service and was housed at Kankakee County Jail on or around June 19, 2019 and resided there for a little over a month.  The U.S. Marshalls Service transferred Mr. Lister to MCC on or around July 25, 2019. MCC is a federal detainment center operated by the Federal Bureau of Prisons ("BOP").  Mr. Lister remains at MCC to this day.

11.     Defendant Russell Heisner is, and at all times relevant to this lawsuit was, the Warden of MCC, and had management and administrative responsibilities at MCC, including

2

inmate medical care, inmate medical grievances, and implementing the BOP's clinical guidance for the management of diabetes. Mr. Lister sues Defendant Heisner in his official capacity.

12. Defendant Zaida Ndife is, and at all times relevant to this lawsuit was, the Health Systems Administrator at MCC, and had management and administrative responsibilities at MCC, including inmate medical care, inmate medical grievances, and implementing the BOP's clinical guidance for the management of diabetes. Mr. Lister sues Defendant Ndife individually and in her official capacity.

13. Defendant Strickland (first name unknown) is, and at all times relevant to this lawsuit was, the Assistant Health Systems Administrator at MCC, and had management and administrative responsibilities at MCC, including inmate medical care, inmate medical grievances, and implementing the BOP's clinical guidance for the management of diabetes. Defendant Strickland is also responsible for administering insulin injections when MCC medical staff are unavailable. Mr. Lister sues Defendant Strickland individually and in his official capacity.

14. Defendant Brij Mohan is, and at times relevant to this lawsuit was, a physician employed at MCC, and, as such, is responsible for the medical care of prisoners housed at MCC. Specifically, he is responsible for consulting with other BOP medical staff members at MCC, training and mentoring BOP medical staff members at MCC, directly evaluating and treating prisoners who have severe illnesses and medically complex conditions at MCC, and implementing the BOP's clinical guidance for the management of diabetes. Mr. Lister sues Defendant Mohan individually and in his official capacity.

15. Defendant Bonnie Nowakowski is, and at times relevant to this lawsuit was, a physician employed at MCC, and, as such, is responsible for the medical care of prisoners housed at MCC. Specifically, she is responsible for consulting with other BOP medical staff members at MCC, training and mentoring BOP medical staff members at MCC, directly evaluating and treating prisoners who have severe illnesses and medically complex conditions at MCC, and implementing the BOP's clinical guidance for the management of diabetes. Mr. Lister sues Defendant Nowakowski individually and in her official capacity.

3

16.     Defendant Harris (first name unknown), was at times relevant to this lawsuit a registered nurse employed at MCC, and, as such, was responsible for administering Mr. Lister's prescribed insulin injections, providing Mr. Lister with his prescribed diabetic snacks and glucose gels, and consulting with a physician when Mr. Lister's blood sugar levels exceed 400 mg/dl. Mr. Lister sues Defendant Harris individually and in her official capacity.

17.     Defendant Clark-Williams (first name unknown) is, and was at times relevant to this lawsuit was, a Lieutenant employed at MCC, and, as such, is responsible for coordinating with MCC's medical staff the timing of Mr. Lister's insulin injections and the delivery of prescribed diabetic snacks and glucose gels. Mr. Lister sues Defendant Clark-Williams in her official capacity.

## ALLEGATIONS

### I.     Mr. Lister Suffers From Type I Diabetes Requiring Acute Medical Treatment and Care.

18.     Mr. Lister suffers from Type I Diabetes, which was diagnosed in February 2002.

19.     Type I Diabetes is a chronic metabolic condition in which the pancreas produces little or no insulin. Insulin is a hormone that is essential for staying alive. Insulin is needed to allow sugar (glucose) to enter cells to produce energy.

20.     There is no cure for Type I Diabetes. Persons with Type I Diabetes, like Mr. Lister, struggle to control their blood sugar and require (i) daily multiple-dose insulin regimens or continuous infusion of insulin via an insulin pump, (ii) diabetic diets, and (iii) regular exercise. Mr. Lister is receiving none of this at MCC.

21.     Prior to his arrest, Mr. Lister treated his Type I Diabetes (i) by continuous infusion of insulin via an insulin pump, (ii) a diabetic diet, and (iii) regular exercise per the instructions of his endocrinologist.

22.     Prior to his arrest, Mr. Lister used an insulin pump and a continuous glucose monitor ("CGM") to constantly monitor his blood sugar. The insulin pump would continuously administer insulin aspart ("Novolog"), a short-acting insulin, through a subcutaneous catheter to

4

maintain Mr. Lister's insulin levels when the CGM detected that Mr. Lister's blood sugar was low.

23.    Prior to his arrest, Mr. Lister's diet generally consisted of high-protein and low-carbohydrate meals consistent with the American Diabetic Association's recommendations.

24.    Prior to his arrest, Mr. Lister also engaged in regular physical activity, including weight lifting, walking, and a physically demanding job.

25.    Prior to his arrest, Mr. Lister did not suffer from neuropathy and had no known vision issues.

26.    After Mr. Lister's arrest on or around June 19, 2019, the U.S. Marshalls Service housed Mr. Lister at the Kankakee County Jail in Kankakee, Illinois for a little over a month.  At the Kankakee County Jail, Mr. Lister continued to treat his Type I Diabetes with Novolog insulin, which was administered via Mr. Lister's insulin pump and CGM.

## II.    Defendants Knowledge of and Deliberate Indifference to Mr. Lister's Type I Diabetes.

### Defendants Remove Mr. Lister's Insulin Pump and CGM.

27.    On or around July 25, 2019, the U.S. Marshalls Service transferred Mr. Lister to MCC, a federal detainment center operated by the BOP.

28.    Upon information and belief, the United States Marshalls Service informed Defendants that Mr. Lister suffers from Type I Diabetes and requires acute medical treatment and care prior to his transfer to MCC.

29.    Upon his arrival at MCC or shortly thereafter, Mr. Lister also informed Defendant Ndife, Defendant Strickland, Defendant Mohan, Defendant Nowakowski, Defendant Harris, and Defendant Clark-Williams that he suffers from Type I Diabetes and requires acute medical treatment and care.

30.    Upon information and belief, Defendants also knew that Mr. Lister suffers from Type I Diabetes and requires acute medical treatment and care because Mr. Lister arrived at MCC wearing his insulin pump and CGM.

31.    The BOP publishes its policies and procedures for the medical management of

5

federal inmates with Type I Diabetes. BOP policies and procedures for the medical management of diabetes is attached hereto as Exhibit A. (*See* Federal Bureau of Prisons, *Clinical Guidance for Management of Diabetes* (2017), Ex. A.)

32.  Upon information and belief, all federal detainment centers operated by the BOP are required to implement and follow the BOP's policies and procedures for the medical management of diabetes.

33.  Defendants intentionally failed to implement and follow BOP policies and procedures for the medical management of diabetes. Defendants continue to intentionally fail to implement and follow BOP policies and procedures for the medical management of diabetes.

34.  Defendants' failure to implement and follow BOP policies and procedures has caused Mr. Lister to suffer serious irreversible harm and place Mr. Lister at risk of serious future harm.

35.  BOP policies and procedures recommend treating federal prisoners with Type I Diabetes with intensive insulin therapy by means of an insulin pump. (*Id.* at 17.)

36.  According to BOP policies and procedures and community standards of care, blood sugar control is the goal of Mr. Lister's diabetes management. This means that Mr. Lister's blood sugar should remain between 90 and 180 milligrams per deciliter ("mg/dl")—between 90 and 130 mg/dl before meals and under 180 mg/dl after meals. (*Id.* at 41-42.) If his blood sugar is ever outside that range, he becomes hypoglycemic (meaning he has low blood sugar) or he becomes hyperglycemic (meaning he has high blood sugar).

37.  When Mr. Lister is hypoglycemic or hyperglycemic, he is put at substantial risk of serious future harm, including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, cardiovascular disease, neuropathy, cataracts, cognitive impairment, skin problems, bone and joint problems, coma, and imminent death.

38.  BOP policies and procedures and community standards of care recognize that (i) intensive insulin therapy (via insulin injections or insulin pumps), (ii) diabetic diets, and (iii) regular exercise are essential for glycemic control and reduction in diabetes-related complications

(including nephropathy, retinopathy, neuropathy, and cardiovascular morbidity and mortality) for persons with Type I Diabetes. (*Id.* at 6, 15-20, 58.)

39.     When Mr. Lister arrived at MCC, Mr. Lister met with Defendant Mohan. Consistent with BOP policies and procedures, Defendant Mohan prescribed that Mr. Lister should continue treating his Type I Diabetes with intensive insulin therapy by means of an insulin pump, CGM, and Novolog insulin.

40.     Defendants continued treating Mr. Lister's Type I Diabetes with intensive insulin therapy by means of an insulin pump, CGM, and Novolog insulin for approximately one week after his arrival at MCC.

41.     After approximately one week at MCC, Defendants prevented and continue to prevent Mr. Lister from receiving intensive insulin therapy.  Defendants removed Mr. Lister's insulin pump and CGM over Mr. Lister's objections despite the fact that Defendant Mohan prescribed that Mr. Lister should continue treating his Type I Diabetes with intensive insulin therapy by means of an insulin pump, CGM, and Novolog insulin and despite the fact that BOP policies and procedures recommend treating federal prisoners with Type I Diabetes with intensive insulin therapy by means of an insulin pump.

42.     After Defendants removed Mr. Lister's insulin pump and CGM, Defendants prevented and continue to prevent Mr. Lister from achieving blood sugar control by delaying and denying him the necessary tools and care for glycemic control, including (i) insulin therapy, (ii) a diabetic diet, and (iii) regular exercise.

43.     As a result of Defendants' deliberate indifference to Mr. Lister's Type I Diabetes and the substandard care provided by Defendants, Mr. Lister now suffers from diabetic neuropathy (a severe form of nerve damage that can lead to decreased blood flow, ulcers, chronic infections, and death), almost daily hypoglycemia (a life-threatening condition that Mr. Lister suffers from when his blood sugar falls below 70 mg/dl), and frequent hyperglycemia (a painful condition that Mr. Lister suffers from when his blood sugar is over 180 mg/dl).  Hypoglycemia and hyperglycemia can cause long-term complications, including cardiovascular disease, neuropathy,

kidney damage, retinopathy, cataracts, cognitive impairment, skin problems, bone and joint problems, and mortality.

44.    Due to Defendants' deliberate indifference to Mr. Lister's Type I Diabetes and the substandard care provided by Defendants, Mr. Lister experiences prolonged periods of hyperglycemia daily.  His blood sugar levels are frequently between 300 and over 600 mg/dl— well over the 180 mg/dl goal for diabetes management.  The glucometer used by MCC medical staff does not record Mr. Lister's exact blood sugar level when his blood sugar level is beyond 600 mg/dl; rather, the glucometer only indicates that Mr. Lister's blood sugar levels are over 600 mg/dl.

45.    During Mr. Lister's hyperglycemic episodes, Mr. Lister experiences pain and he is put at risk for long-term complications, including cardiovascular disease, neuropathy, kidney damage, retinopathy, cataracts, cognitive impairment, skin problems, and bone and joint problems. Due to the daily hyperglycemic episodes that Mr. Lister has experienced at MCC for the last six months, Mr. Lister has started to experience neuropathy and acute vision complications.

46.    Due to Defendants' deliberate indifference to Mr. Lister's Type I Diabetes and the substandard care provided by Defendants, Mr. Lister also frequently experiences hypoglycemia for prolonged periods of time, especially at night when Defendants fail to provide him with his medically prescribed diabetic snack or glucose gels.  At these times, Mr. Lister's blood sugar falls below 70 mg/dl.  When Mr. Lister's blood sugar falls below 70 mg/dl, he risks cerebral damage and sudden death.

47.    Mr. Lister continues to suffer frequent episodes of hypoglycemia and hyperglycemia today as a result of the continued substandard care provided by Defendants, Defendants' deliberate indifference to Mr. Lister's Type I Diabetes, Defendants' failure to follow the standard of care for those with Type I Diabetes, and Defendants' failure to follow BOP's own policies and procedures for treating Type I Diabetes.

48.    Upon information and belief, Mr. Lister is also suffering from and at greater risk of long-term complications, including cardiovascular disease, neuropathy, kidney damage, retinopathy, cataracts, cognitive impairment, skin problems, bone and joint problems, and

mortality.

49.     Elevated A1C levels indicate that a person with Type I Diabetes is suffering from or at greater risk of long-term complications, including cardiovascular disease, neuropathy, kidney damage, retinopathy, cataracts, cognitive impairment, skin problems, bone and joint problems, and mortality.

50.     Before Mr. Lister was transferred to MCC, Mr. Lister's Hemoglobin A1C was 7.1%. Hemoglobin A1C testing evaluates the average amount of glucose in the blood over the last two to three months by measuring the percentage of glycated hemoglobin in the blood. Mr. Lister's Type I Diabetes is considered under control when his Hemoglobin A1C is <7.0–7.5%. (*Id.* at 41.) In August 2019, 3 weeks after entering the MCC, Mr. Lister's Hemoglobin A1C was 8.4%. This is a drastic change for such a short period of time. Mr. Lister's Hemoglobin A1C is still too high.

51.     According to BOP policies and procedures and community standards of care, Mr. Lister can only control his blood sugar through the three keys of diabetes management: proper medication, diet, and exercise. (*Id.* at 6, 15-20, 58.)

52.     While at MCC, Mr. Lister relied on Defendants for proper medication, diet, and exercise, but, the Defendants are preventing Mr. Lister from receiving all three aspects of the required medical treatment.

***Defendants Denied and Continue to Deny Mr. Lister Proper Insulin Therapy.***

53.     Defendants denied, and continue to deny, Mr. Lister the ability to manage his diabetes through medication, the first key to managing diabetes.

54.     Mr. Lister requires insulin to live because of his Type I Diabetes.

55.     BOP policies and procedures and community standards of care recognize that Type I Diabetes should be treated with intensive insulin therapy administered continuously via insulin pumps or multiple times a day via injection. (*Id.* at 17.)

56.      Defendants refused to continue the medical treatments previously prescribed by Mr. Lister's endocrinologist, including (1) continuously administering insulin via insulin pump—which BOP policies and procedures recommend—(2) providing Novolog insulin; (3) providing a

9

diabetic diet; and (4) providing opportunities for daily exercise.

57. After Defendants removed Mr. Lister's insulin pump and CGM, Defendant Mohan prescribed that Mr. Lister receive insulin and blood sugar tests four times a day, coordinated with meals and a prescribed nighttime diabetic snack, via manual injection even though Mr. Lister was previously prescribed an insulin pump and even though BOP policies and procedures permit insulin pumps.

58. Because Defendants removed Mr. Lister's insulin pump, which administered Novolog insulin, a short-acting insulin, Mr. Lister requires multiple injections of both a short-acting and long-acting insulin to control his blood sugar levels.

59. Defendant Mohan prescribed that Mr. Lister receive Regular (human) Humulin R/Novolin R ("R") (a short-acting insulin) and NPH (human) Humulin N/Novolin N ("NPH") (a long-acting insulin) even though he was previously prescribed Novolog.

60. Upon information and belief, R (short-acting) and NPH (long-acting) insulins are less effective than Novolog (short-acting) and insulin glargine ("Lantus") (long-acting) at treating Type I Diabetes and providing glycemic control.

61. Upon information and belief, Novolog and Lantus are available at MCC.

62. Mr. Lister asked Defendants Mohan, Nowakowski, Ndife, and Strickland multiple times for an insulin pump and/or to switch his prescription to Novolog and Lantus insulins. Defendants Mohan, Nowakowski, Ndife, and Strickland refused to allow insulin therapy via insulin pump and told Mr. Lister that Novolog and Lantus insulins would instead be made available to him. To this day, Mr. Lister's prescription has not been switched to Novolog and Lantus.

63. Defendants refuse to follow BOP policies and procedures and the treatment protocol prescribed by Defendant Mohan in several ways:

64. First, despite Defendant Mohan's prescription that Mr. Lister receive a fixed amount of insulin by injection four times a day and BOP policies and procedures that recognize that Mr. Lister should receive intensive insulin therapy, Defendants only administer Mr. Lister's injections 3 times a day on weekends and holidays.

65.     Second, despite Defendant Mohan's prescription that Mr. Lister receive a fixed amount of insulin by injection four times a day and BOP policies and procedures that recognize that Mr. Lister should receive intensive insulin therapy, Defendants only administer Mr. Lister's injections 3 times a day on certain weekdays.

66.     Mr. Lister estimates that he only receives his four prescribed daily insulin injections 50% of the time.

67.     When Mr. Lister does not receive one of his four scheduled insulin injections, he suffers from hyperglycemia and pain for prolonged periods of time because his body does not have any insulin to regulate and balance his blood sugar levels.

68.     Third, Defendants refuse to coordinate Mr. Lister's meals with his insulin and all of Mr. Lister's insulin injections are administered after meals—usually between one and three hours after a meal—contrary to BOP policies and procedures and community standards of care and reducing the efficiency of the insulin.

69.     Defendant Mohan prescribed that Mr. Lister receive insulin injections with meals and with his nighttime snack because insulin therapy is most effective if the insulin is administered before meals.

70.     BOP policies and procedures and community standards of care recognize the need to administer insulin before meals. (*Id.* at 19.) Community standards of care recognize that insulin is typically administered 20 minutes before meals. BOP policies and procedures further state that if insulin cannot be administered before meals, it should be "administered immediately after eating." (*Id.*)

71.     BOP policies and procedures instruct that federal correctional institutions, like MCC, "should consider developing local processes to ensure that insulin dosing is timed appropriately and that the proper precautions have been implemented should dosing times be interrupted." (*Id.* at 20.)

72.     According to BOP policies and procedures, providing insulin after meals may require additional insulin than would otherwise be required if the insulin had been administered

11

before the meal and can also result in hyperglycemia and the worst result is severe hypoglycemia. (*Id.* at 19.)  Defendants consistently provide insulin therapy to Mr. Lister after meals. Consequently, Mr. Lister regularly requires additional insulin, which Defendants regularly deny and withhold from Mr. Lister.  Due to Defendants consistent failure to provide Mr. Lister with insulin at appropriate times, Mr. Lister regularly suffers from hyperglycemia and hypoglycemia, neuropathy, and acute vision complications.

73.     Defendants have failed to develop local processes to ensure that insulin dosing is timed appropriately and that the proper precautions have been implemented should dosing times be interrupted.

74.     Rather than receiving his insulin injections 20 minutes before meals, with his meals, or immediately following his meals, Defendants generally administer all of Mr. Lister's insulin injections one to three hours after Mr. Lister's meals, causing Mr. Lister to suffer from hyperglycemia and pain for prolonged periods of time because his body does not have any insulin to regulate and balance his blood sugar levels.

75.     On weekdays, Defendants administer Mr. Lister's breakfast insulin injection between 7:00 and 9:00 a.m., one to three hours after his 6:00 a.m. breakfast, causing Mr. Lister to suffer from sever hyperglycemia and pain for prolonged periods of time.

76.     On weekends, Defendants administer Mr. Lister's breakfast insulin injection between 9:00 and 10:00 a.m., two to three hours after his 7:00 a.m. breakfast, causing Mr. Lister to suffer from severe hyperglycemia and pain for prolonged periods of time.

77.     On weekdays and weekends, Defendants administer Mr. Lister's lunch insulin shot at 12:30 p.m., approximately 2 hours after his 10:30 a.m. lunch, causing Mr. Lister to suffer severe hyperglycemia and pain for prolonged periods of time.

78.     On weekdays and weekends, Defendants administer Mr. Lister's dinner insulin shot at 6:30 or 6:45 p.m., approximately 2 hours after his 4:45 meal, causing Mr. Lister to suffer severe hyperglycemia and pain for prolonged periods of time.

79.     On some occasions, Defendants administer Mr. Lister's insulin over three hours

after his meals, causing Mr. Lister to suffer severe hyperglycemia and for prolonged periods of time.

80.     Due to the delay in Defendants administering Mr. Lister's insulin, his blood sugar is frequently between 300 and over 600 mg/dl, which means Mr. Lister is suffering from severe hyperglycemia and pain for prolonged periods of time.

81.     Hyperglycemia is a painful condition which can cause long-term complications, including cardiovascular disease, neuropathy, kidney damage, retinopathy, cataracts, cognitive impairment, skin problems, and bone and joint problems.  Mr. Lister regularly suffers from hyperglycemia due to the delay in Defendants administering Mr. Lister's insulin.  Consequently, Mr. Lister is suffering from neuropathy, pain, and acute vision complications, severe headaches, weight gain, severe fluctuating blood sugar levels, and pain/numbness in his hands, feet, and legs.

82.     When Mr. Lister suffers from severe hyperglycemia, Defendants must administer additional insulin to regulate and balance Mr. Lister's blood sugar levels.

83.     For breakfast, Mr. Lister receives 12 units of R insulin (short-acting) and 45 units of NPH insulin (long-acting).  For lunch and dinner, Mr. Lister receives 5 units of R insulin (short-acting) and 25 units of NPH insulin (long-acting).  Those amounts of insulin are consistent with the assumption that Mr. Lister will receive insulin injections before meals or immediately following meals and that Mr. Lister's blood sugar level will not exceed 150 mg/dl.  However, Defendants are deliberately indifferent to Mr. Lister's Type I Diabetes and generally administer Mr. Lister's insulin between one and three hours after meals, and sometimes over three hours after meals.  When Mr. Lister does not receive insulin before meals or immediately following meals, his blood sugar levels spike, which is why he frequently suffers from prolonged periods of hyperglycemia and why his blood sugar is frequently between 300 and over 600 mg/dl. Consequently, Mr. Lister requires more insulin than he is prescribed to regulate his blood sugar levels.

84.     When Mr. Lister's blood sugar is exceeds 150 mg/dl following a meal because of Defendants' deliberate indifference to his Type I Diabetes, Defendants generally administer

additional insulin according to the following schedule:

| Blood Sugar Level | Amount of Additional R Insulin |
|---|---|
| 150-250 mg/dl | 4 units |
| 250-300 mg/dl | 6 units |
| 300-350 mg/dl | 8 units |
| 350-400 mg/dl | 10 units |

85.     When Mr. Lister's blood sugar exceeds 400 mg/dl, Defendant Harris, Defendant Strickland, and other MCC medical staff who administer Mr. Lister's insulin are required to consult with a physician to determine the correct amount of additional insulin that should be administered to Mr. Lister to bring his blood sugar levels within an acceptable range. Mr. Lister's blood sugar regularly exceeds 400 mg/dl and frequently exceeds 600 mg/dl. Defendant Harris, Defendant Strickland, and other MCC medical staff who administer Mr. Lister's insulin never contact a physician when Mr. Lister's blood sugar exceeds 400 mg/dl. Instead, they administer 10 additional units of R insulin (the amount required when Mr. Lister's blood sugar is between 350 and 400 mg/dl), and Mr. Lister is required to endure long periods of hyperglycemia and pain even after his insulin is administered because he is not receiving enough insulin to bring his elevated blood sugar levels within an acceptable range.

86.     When Defendant Harris, Defendant Strickland, and other MCC medical staff administer Mr. Lister's insulin injections, they record Mr. Lister's blood sugar levels in his medical file.

87.     Defendants have access to Mr. Lister's medical file. Defendant Mohan, Defendant Nowakowski, Defendant Ndife, Defendant Strickland, and Defendant Harris regularly review Mr. Lister's medical file. Even though Mr. Lister's medical records reflect that Mr. Lister's blood sugar levels are constantly elevated and that Defendant Harris, Defendant Strickland, and other MCC medical staff are consistently administering too little insulin too late without consulting a phsysican, no Defendant has intervened to provide Mr. Lister with adequate medical care.

14

88.     Defendant Mohan also prescribed Mr. Lister a diabetic snack to be taken with his evening insulin shot at 8:30 p.m. and glucose gels to be taken if Mr. Lister suffers from hypoglycemia.  However, Defendants rarely provide Mr. Lister with the diabetic snack or enough glucose gels.  Mr. Lister generally only receives the snack 3 days per week.  When Mr. Lister does not receive his diabetic snack or glucose gel, his blood sugar often falls below 70 mg/dl and he suffers from hypoglycemia, which is a life-threatening condition.

89.     Defendants know Mr. Lister suffers from Type I Diabetes.  Defendants have knowingly withheld proper treatment from Mr. Lister.  Defendants' deliberate indifference to Mr. Lister's Type I Diabetes has caused him to suffer from neuropathy in his feet and hands for the first time in his life and blurred vision.  Mr. Lister is also likely to be suffering from or at greater risk for long-term complications that are not immediately identifiable in the correctional setting.

90.     Upon information and belief, recognizing that federal prisoners with Type I Diabetes are at risk of developing long-term complications that are not immediately identifiable in the correctional setting, MCC allows some of its prisoners with Type I Diabetes to regularly visit outside endocrinologists.  At this time, Defendants have never allowed Mr. Lister to visit an outside endocrinologist while confined at MCC.

91.     Defendants deliberate indifference to Mr. Lister's Type I Diabetes places Mr. Lister at risk for long-term complications, including cardiovascular disease, neuropathy, kidney damage, retinopathy, cataracts, cognitive impairment, skin problems, and bone and joint problems.  Due to Defendants deliberate indifference, Mr. Lister now suffers from long-term complications, including neuropathy and deteriorating vision.  If Defendants continue to withhold proper treatment from Mr. Lister, his neuropathy and vision will continue to worsen and he will also begin developing additional long-term complications.

92.     Mr. Lister has reported to Defendants on multiple occasions that (i) he is not receiving insulin injections 4 times a day as prescribed; (ii) he is not receiving insulin injections before meals as he should be; (iii) he is receiving insulin injections one to three hours after meals, and sometimes even later; (iv) he is not receiving additional insulin when his blood sugar exceeds

15

400 mg/dl; (v) MCC medical staff are not consulting with Defendant Mohan or Defendant Nowakowski when Mr. Lister's blood sugar exceeds 400 mg/dl; (vi) he is not receiving diabetic snacks every day or glucose gel as prescribed; (vii) he is not receiving diabetic meals; (viii) he should be receiving Novolog and Lantus insulins; (ix) he is suffering from neuropathy in his feet and hands for the first time in his life; (x) he is suffering from blurred vision; (xi) he is experiencing significant weight gain, which is placing him at risk of developing long-term complications; and (xii) he is suffering for hyperglycemia and hypoglycemia.

93.     Defendants have ignored Mr. Lister's requests for proper medical treatment despite knowing that Mr. Lister suffers from Type I Diabetes and despite knowing that Mr. Lister is now suffering from complications related to his Type I Diabetes caused by Defendants' deliberate indifference.

94.     On one occasion, on August 17, 2019, Mr. Lister ate dinner at 5:00 p.m.  Defendant Harris arrived at 7:12 p.m. to administer his insulin injection at which time Mr. Lister's blood sugar was 326 mg/dl.  Mr. Lister informed Defendant Harris that he never received his diabetic snack for that night.  Defendant Harris replied that Mr. Lister would not be receiving his diabetic snack or his 8:30 insulin injection because her shift would be ending before Mr. Lister's scheduled check.  Defendant Harris' deliberate indifference to Mr. Lister's medical needs cause Mr. Lister to experience pain that night, contributed to the long-term complications that Mr. Lister is now suffering from, and placed him at additional risk of developing other long-term complications.

95.     MCC and Defendants do not employ overnight medical staff despite having Mr. Lister, a Type I Diabetic, in their care.

96.     On several occasions at night, Mr. Lister's blood sugar as dropped causing him to suffer from severe hypoglycemia, which is a life threatening condition.  Defendants were not present to treat nor were any staff present to provide Mr. Lister with medical treatment.  Mr. Lister could have died on those nights.

97.     On one occasion, during a hypoglycemic episode after 10:00 p.m. at night, Mr. Lister notified Defendant Clark-Williams that his blood sugar was dropping to dangerously low

16

levels. Defendant Clark-Williams said that she was unable to provide him with any food to raise his blood sugar because there were no MCC prison or medical personnel still working in the kitchen or health care unit to provide Mr. Lister with food. Defendant Clark-Williams further threatened that if Mr. Lister's blood sugar continued to drop to the point where he needed hospitalization that Mr. Lister would have to pay for any and all costs.

98.     Mr. Lister's hypoglycemia caused by Defendants' knowing indifference to his medical needs caries a substantial risk of death.

99.     Defendants have refused to provide Mr. Lister with appropriate insulin therapy, the fundamental first key to managing Type I Diabetes; therefore, Defendants have denied and continue to deny Mr. Lister the ability to manage his Type I Diabetes, and Defendants' denial has substantially harmed Mr. Lister or put him at substantial risk of serious future harm, including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, cardiovascular disease, neuropathy, retinopathy, cataracts, cognitive impairment, skin problems, bone and joint problems, coma, and imminent death.

***Defendants Denied and Continue to Deny Mr. Lister a Diabetic Diet.***

100.     Defendants denied and continue to deny Mr. Lister the ability to manage his diabetes through diet, the second key to managing diabetes.

101.     Mr. Lister must always adhere to a strict dietary regimen and meal time schedule because of his Type I Diabetes.

102.     According to BOP policies and procedures and community standards of care, Mr. Lister should eat a consistent amount of carbohydrates at each meal and have a means to identify the amount of carbohydrates in each food item in his meals. (*Id.* at 8-9.) The purpose of carbohydrate counting is to allow Mr. Lister the ability to plan the proper balance of diet, exercise, and medication. The BOP policies and procedures and community standards of care also recognize that Mr. Lister's Type I Diabetes requires the management of LDL and total cholesterol values. (*See id.*)

103.     Despite recognition of such need to manage Mr. Lister's diabetes by rationing foods

17

within a strict range, Mr. Lister has repeatedly received inadequate dietary care throughout his incarceration at MCC. Specifically, Defendants have failed to provide Mr. Lister with meals with consistent amount of carbohydrates, a means for Mr. Lister to count carbohydrates, his prescribed diabetic snack, and glucose gels.

104. In turn, Mr. Lister has filed grievances and repeatedly notified Defendants that he is not receiving proper medical treatment.

105. After Mr. Lister notified Defendants that he was not receiving a diabetic diet, Defendants instructed MCC personnel to give Mr. Lister a 1,500 calorie diet. Lister never received the prescribed 1,500 calorie diet.

106. When Mr. Lister told Defendants that he was not receiving the prescribed 1,500 calorie diet, Defendants instructed Mr. Lister to eat half of his meals to approximate a diabetic diet. However, MCC does not serve meals with consistent calorie or carbohydrate amounts. Nor does MCC provide dietary nutrition information to allow carbohydrate counting. Thus, eating half portions does not come close to approximating a diabetic diet.

107. After Defendants refused to provide Mr. Lister with his prescribed diabetic meal, Mr. Lister requested that he receive a religious diet which is high in protein and low in carbohydrates. The religious meals provide nutritional content that is similar to the diabetic meals. Mr. Lister's request was denied because he does not belong to a faith that requires a religious diet. The meals are available but Defendants refuse to provide Mr. Lister with them.

108. Despite his necessary medically prescribed diet, however, strict adherence has not been carried out.

109. To this date, despite the clear medical need, acknowledgment of such a need, and the availability of the required diet, Mr. Lister continues to receive a standard prison diet containing foods that are harmful to his health.

110. Moreover, Mr. Lister not only receives an inappropriate diet which increases the amount of insulin that he needs, Defendants compound the problem by not giving Mr. Lister his insulin injections until approximately one to three hours after his meals. At which point he is

hyperglycemic and needs additional insulin, which is denied when his blood sugar levels exceed 400 mg/dl.

111.    Defendants also fail to consistently provide Mr. Lister with his prescribed diabetic snack and glucose gels at night.  Consequently, Mr. Lister regularly suffers from hypoglycemia at night without means to raise his blood sugar levels.

112.    At the time of this filing, Mr. Lister also does not have the option to treat his Type I Diabetes with diabetic snacks purchased through commissary when Defendants fail to provide Mr. Lister with his prescribed diabetic snack and glucose gels because the MCC is on lockdown and all MCC inmates are denied access to the commissary.

113.    As a result of Defendants failure to provide Mr. Lister with a diabetic diet, Mr. Lister suffers ongoing injuries of diabetic neuropathy, severe headaches, weight gain, deteriorating vision, severe fluctuating blood sugar levels, and pain/numbness in his hands, feet, and legs.

***Defendants Denied and Continue to Deny Mr. Lister Opportunities for Regular Exercise.***

114.    Defendants denied and continue to deny Mr. Lister the ability to manage his Type I Diabetes through exercise, the third key to managing diabetes.

115.    According to BOP policies and procedures and community standards of care, Mr. Lister must exercise in order to manage his Type I Diabetes, but he can only do so when the exercise is coordinated with his meals and medication.  If this coordination is lacking, exercise causes Mr. Lister's blood sugar to plummet to dangerously low levels.

116.     Because Defendants deny Mr. Lister the ability to manage his Type I Diabetes through exercise, Mr. Lister has gained over 30 pounds since his arrest.  Drastic weight gain can have adverse effect on Type I Diabetics.

117.    At MCC, the maximum amount of out-of-cell exercise permitted to Mr. Lister is approximately 45 minutes, 4 times a week.  Some weeks Defendants provide less exercise because Defendants and MCC staff arbitrarily cancel recreation time.

118.    Defendants continue to exclude Mr. Lister from daily physical activity by requiring him to choose between out-of-cell physical activity or receiving his insulin at MCC.

119.     If Mr. Lister attends out-of-cell recreation, he is unable to receive his insulin injection because Defendants require Mr. Lister to wait one to three hours after a meal to receive his late insulin injection.  By the time he receives his insulin, the 45 minute period for out-of-cell physical activity has passed.  Mr. Lister is unable to engage in out-of-cell physical activity.

120.     Defendants' delay and denial of Mr. Lister's ability to exercise have prevented him from utilizing the third key to managing diabetes; therefore, Defendants have denied and continue to deny Mr. Lister the ability to manage his Type I Diabetes, and Defendants' delay and denial have substantially harmed Mr. Lister or put him at substantial risk of serious future harm, including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, cardiovascular disease, neuropathy, retinopathy, cataracts, cognitive impairment, skin problems, bone and joint problems, coma, and imminent death.

### III.     Mr. Lister's Attempts to Receive His Medically Necessary Treatment and Care.

121.     Mr. Lister has reported to Defendants on multiple occasions that (i) he is not receiving insulin injections 4 times a day as prescribed; (ii) he is not receiving insulin injections before meals as he should be; (iii) he is receiving insulin injections one to three hours after meals, and sometimes even later; (iv) he is not receiving additional insulin when his blood sugar exceeds 400 mg/dl; (v) MCC medical staff are not consulting with Defendant Mohan or Defendant Nowakowski when Mr. Lister's blood sugar exceeds 400 mg/dl; (vi) he is not receiving diabetic snacks every day or glucose gel as prescribed; (vii) he is not receiving diabetic meals; (viii) he should be receiving Novolog and Lantus insulins; (ix) he is suffering from neuropathy in his feet and hands for the first time in his life; (x) he is suffering from blurred vision; (xi) he is experiencing significant weight gain, which is placing him at risk of developing long-term complications; and (xii) he is suffering for hyperglycemia and hypoglycemia.

122.     On one occasion, Defendant Mohan followed up with Mr. Lister regarding his insulin injections.  Defendant Mohan asked if Mr. Lister is receiving injections four times a day at the times prescribed.  Mr. Lister told Defendant Mohan he was not.  Defendant Mohan replied, "OK," and walked away.

20

123.    Mr. Lister has repeatedly told Defendants that he is experiencing extremely elevated blood sugar levels for prolonged periods of time.  Defendants are also aware that Mr. Lister has been experiencing extremely elevated blood sugar levels for prolonged periods of time because MCC medical staff records his blood sugar levels when insulin is administered. Defendants have never followed up with Mr. Lister to change the amount of insulin he receives and the timing of his injections, despite knowing his blood sugar levels are extremely elevated.

124.    In August 2019, shortly after his insulin pump was removed, Mr. Lister filed a formal grievance, notifying Defendants that that (i) he is not receiving insulin injections 4 times a day as prescribed; (ii) he is not receiving insulin injections before meals as he should be; (iii) he is receiving insulin injections one to three hours after meals; (iv) he is not receiving diabetic snacks every day or enough glucose gels; (v) he is not receiving diabetic meals; (vi) he is not able to regularly exercise because of his delayed insulin injections; and (vii) he is suffering from severe hyperglycemia and hypoglycemia.

125.    Mr. Lister never received a response to his formal grievance.

126.    After filing his formal grievance, Mr. Lister met with Defendant Ndife.  Defendant Ndife told Mr. Lister that she could not ensure that Mr. Lister receives his insulin injections before meals and that she would issue him call passes at 6:30 a.m., 12:00 p.m., 5:00 p.m., and 8:30 p.m. so that he can receive insulin at consistent times after his meals.  However, Defendants never followed the call pass schedule arranged by Defendant Ndife and Defendants revoked the call passes on or around January 20, 2020.

127.    Even if Defendants followed the call pass schedule, Mr. Lister would still not receive his insulin therapy at appropriate times coordinated with his meal schedule.  Notably, Defendant Ndife scheduled his lunchtime insulin injection to be administered an hour and a half after lunch, contrary to BOP policies and procedures and the standard of medical care.

128.    After not receiving a response to his formal grievance and repeated requests for adequate treatment, on October 19, 2019, Mr. Lister attempted to notify Defendants that he was not receiving adequate medical treatment for his Type I Diabetes by sending an email through

21

MCC's email system for inmates.  Mr. Lister never received a response.

129.    Again, after not receiving a response to his formal grievance and repeated requests for adequate treatment, on October 23, 2019, Mr. Lister attempted to notify Defendants that he was not receiving adequate medical treatment for his Type I Diabetes by sending an email through MCC's email system for inmates.  Mr. Lister never received a response.

### COUNT I – FAILURE TO PROVIDE ADEQUATE MEDICAL TREATMENT
### 42 U.S.C. § 1983
### (Against all Defendants in Their Official Capacity)

130.    Mr. Lister repeats and re-alleges the allegations contained in paragraphs 1 through 129 as if fully restated here.

131.    From the date of his incarceration, Mr. Lister has an objectively, sufficiently serious injury, namely Type I Diabetes, which required ongoing medical care and treatment, including insulin, strict adherence to Mr. Lister's dietary needs, and regular exercise. The need for such care is well-documented in Mr. Lister's records, as well as well-recognized in this Circuit.

132.    Since as early as July 25, 2019, Defendants have been on notice of Mr. Lister's serious medical and dietary needs related to his Type I Diabetes.

133.    Despite possessing this knowledge, the Defendants each intentionally, with criminal recklessness, through repeated acts of negligence disregarded or with deliberate indifference to the serious medical needs of Mr. Lister by (a) failing to allow Mr. Lister to continue insulin therapy by insulin pump, (b) failing to provide insulin injections four times a day, (c) failing to provide insulin injections before meals and instead administering insulin injections one to three hours after meals, (d) failing to coordinate the amount of insulin with the calories Mr. Lister consumes, (e) failing to provide Mr. Lister with a diabetic diet, (f) failing to provide Mr. Lister with prescribed diabetic snacks and glucose gels, (g) failing to allow Mr. Lister regular physical activity, and (h) failing to take steps to ensure that the treatment plan was properly carried out.

134.    Further, each Defendant, despite possessing the knowledge regarding Mr. Lister's serious medical condition, denied access to adequate medical care and knowingly disregarded

excessive risks to Plaintiff's health and well-being by, among other things, (a) refusing to allow him to continue insulin therapy via insulin pump and CGM, (b) refusing to take corrective action measures, (c) allowing and condoning the actions of the medical department, health system administrator, and assistant health system administrator to disregard Mr. Lister's prescribed treatment protocol and the BOP's instituted diabetes policies, (d) failing to supervise medical staff, (e) failing to employ enough medical staff to provide adequate medical treatment; and (f) knowingly and deliberately refusing to follow proper procedure in conducting a complete and thorough investigation into the grievances submitted by Mr. Lister.

135. Each of the above-described actions were in contravention of the policies and procedures in place at MCC and contrary to sound medical care for treating and managing Plaintiff's chronic medical condition.

136. Defendants continue to refuse to provide Mr. Lister the proper insulin therapy and the medically necessary diabetic diet proscribed by Defendant Mohan.

137. The Defendants' ongoing deliberate indifference has deprived Mr. Lister of his right to be free from cruel and unusual punishment as secured to him under the Eighth Amendments to the United States Constitution, and has resulted in actual harm in the form of severe headaches, diabetic neuropathy, weight gain, poor vision, depression, severe fluctuating blood sugar levels and pain/numbness in his hands, feet and legs.

WHEREFORE, Plaintiff Brian Lister, respectfully requests that this Court:

A.   Declare the conduct of Defendants to have violated the rights guaranteed to Mr. Lister under appropriate Federal Law;

B.   Order Defendants to make whole Mr. Lister by providing the affirmative relief necessary to ensure that Defendants comply with the standard of care for Type I Diabetes;

C.   Grant Mr. Lister actual, consequential, compensatory, punitive and any other damages that the Court may deem appropriate against Defendants;

D.   Award Mr. Lister his costs and reasonable attorney's fees pursuant to 42

U.S.C. § 1988;

E.     Enter such other appropriate relief.

## COUNT II – FAILURE TO PROVIDE ADEQUATE MEDICAL TREATMENT
## 42 U.S.C. § 1983
**(Against Mohan, Nowakowski, Ndife, Strickland, and Harris in Their Individual Capacity)**

138.     Mr. Lister repeats and re-alleges the allegations contained in paragraphs 1 through 137 as if fully restated here.

139.     Defendants had a duty to provide all prisoners, including Mr. Lister, with adequate medical treatment for serious medical conditions.

140.     Defendants were deliberately indifferent to Mr. Lister's medical needs.

141.     From the date of his incarceration, Mr. Lister has an objectively, sufficiently serious injury, namely Type I Diabetes, which required ongoing medical care and treatment, including strict adherence to Mr. Lister's insulin therapy, dietary needs, and physical activity. The need for such care is well-documented in Mr. Lister's records, as well as well-recognized in this Circuit and the BOP's policies and procedures.

142.     Since as early as July 25, 2019, Defendants have been on notice of Mr. Lister's serious medical and dietary needs related to his Type I Diabetes.

143.     Defendants were each aware of Mr. Lister's serious medical condition, but acted with a sufficiently culpable state of mind, in that they each knew Mr. Lister faced a substantial risk of harm and disregarded that risk.

144.     As a result of Defendants' conduct, Mr. Lister's diabetes has become more severe, including more frequent severe headaches and increasing diabetic neuropathy, Mr. Lister has continued to suffer from weight gain, increasingly impaired vision, depression, and Mr. Lister has continued to experience a significant amount of pain and discomfort, all of which continue today.

145.     Defendants showed deliberate indifference to Mr. Lister's serious medical needs, through their actions, which include, but are not limited to, (a) failing to follow BOP policies and procedures for the medical treatment of diabetes, (b) negligently ignoring Mr. Lister's repeated

complaints regarding the improper medical treatment and the improper diet being provided him; (c) negligently ignoring Mr. Lister's Type I Diabetes and Mr. Lister's medically necessary insulin therapy, diabetic meal plan, and exercise schedule; and (d) recklessly failing to conduct the proper medical inquiries into Mr. Lister's complaints and to treat the inquiries with the prescribed insulin therapy, diabetic diet, and exercise schedule.

146.    As licensed physicians, and as a result of Mr. Lister's repeated requests for medical treatment, Mohan and Nowakowski were aware of the risks associated with Mr. Lister's serious medical condition, yet disregarded those risks by failing to ensure that Mr. Lister's received the prescribed and appropriate care while incarcerated at MCC. Mohan and Nowakowski also failed to ensure that MCC's staff adhered to the BOP's policies and procedures for treating Type I Diabetes.

147.    As the Health Systems Administrator, and as a result of Mr. Lister's repeated requests for medical treatment, Ndife was aware of the risks associated with Mr. Lister's serious medical condition, yet disregarded those risks by failing to ensure that Mr. Lister's received the prescribed and appropriate care while incarcerated at MCC.  Ndife also failed to ensure that MCC's staff adhered to the BOP's policies and procedures for treating Type I Diabetes.

148.    As the Assistant Health Systems Administrator, and as a result of Mr. Lister's repeated requests for medical treatment, Strickland was aware of the risks associated with Mr. Lister's serious medical condition, yet disregarded those risks by failing to ensure that Mr. Lister's received the prescribed and appropriate care while incarcerated at MCC.   Strickland also failed to ensure that MCC's staff adhered to the BOP's policies and procedures for treating Type I Diabetes.

149.    As a registered nurse, and as a result of Mr. Lister's repeated requests for medical treatment, Harris was aware of the risks associated with Mr. Lister's serious medical condition, yet disregarded those risks by failing to conduct a proper investigation into Mr. Lister's medical history and history of grievances, and failing to ensure that Mr. Lister's received the prescribed and appropriate care while incarcerated at MCC.

150.    The Defendants' ongoing deliberate indifference has deprived Mr. Lister of his

right to be free from cruel and unusual punishment as secured to him under the Eighth Amendments to the United States Constitution, and has resulted in actual harm in the form of severe headaches, diabetic neuropathy, weight gain, poor vision, severe fluctuating blood sugar levels and pain/numbness in his hands, feet and legs.

WHEREFORE, Plaintiff Brian Lister, respectfully requests that this Court:

A.    Declare the conduct of Defendants to have violated the rights guaranteed to Mr. Lister under appropriate Federal Law;

B.    Order Defendants to make whole Mr. Lister by providing the affirmative relief necessary to ensure that Defendants comply with the standard of care for Type I Diabetes;

C.    Grant Mr. Lister actual, consequential, compensatory, punitive and any other damages that the Court may deem appropriate against Defendants;

D.    Award Mr. Lister his costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

E.    Enter such other appropriate relief.

## DEMAND FOR JURY TRIAL

Pursuant to the Federal Rule of Civil Procedure 38(b), Mr. Lister demands trial by jury for all of the issues pled so triable.

Dated: January 31, 2020

Respectfully submitted,

**JENNER & BLOCK LLP**

By: */s/ John R. Storino*
    John R. Storino
    Brandon J. Polcik
    353 N. Clark Street
    Chicago, IL 60654-3456
    Phone: (312) 222-9350
    Fax: (312) 527-0484
    JStorino@jenner.com
    BPolcik@jenner.com

    *Counsel for Plaintiff Brian Mr. Lister*

## **VERIFICATION**

I, Brian Lister, have read the foregoing First Amended Complaint and hereby state that the statements contained therein are true and correct except as to those matters which are based on information and belief and as to those, I believe them to be true.

Executed on this 30 th day of January, 2020, in Chicago, Illinois

Brian Lister

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on January 31, 2020, the foregoing was filed electronically with the Clerk of the Court to be served on all counsel of record by operation of the Court's CM/ECF filing system.

By: *_/s/ John R. Storino_*